Filed 6/27/25  P. v. Moreno CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO MORENO,<br><br>    Defendant and Appellant. | H051637<br>(Santa Clara County<br> Super. Ct. No. C1921701) |

A jury convicted defendant Antonio Moreno of committing various sexual acts against two minor girls, G.D. and J.D.[1]  Moreno alleges that the trial court violated his Sixth Amendment right to confront the witnesses against him when, after the trial court had already admitted J.D.'s preliminary examination testimony under Evidence Code section 1291[2] due to her unavailability, it declined to continue the trial to receive evidence concerning new information as to J.D.'s availability and competence to testify. We conclude that the trial court did not abuse its discretion in denying the defense's request for a continuance and an evidentiary hearing to determine J.D.'s availability and mental state.

---

[1] A pseudonym was used for the victims' last name in the information and at trial. We refer to the victims by the initials of the names used in the proceedings below to protect their privacy interests.  (See Cal. Rules of Court, rule 8.90(b)(4).)

[2] Unspecified statutory references are to the Evidence Code.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Charges and Preliminary Examination*

The prosecution charged Moreno in a complaint with four counts of lewd or lascivious acts against two girls under the age of 14 (Pen. Code, § 288, subd. (a).) Moreno was the boyfriend of the girls' grandmother. As the prosecution noted in its trial brief, the girls "initially disclosed a couple of incidents in which [Moreno] kissed them and touched them on their vaginas" and then "they disclosed substantially more abuse" during their August 2021 preliminary examination testimony.

One of the girls, G.D., testified at the preliminary examination that Moreno committed various acts on her, including touching her breasts, touching and penetrating her vagina with his fingers, touching her "butt," and pulling her wrist in an effort to get her to touch his penis. G.D. testified that she reported Moreno's actions after she found Moreno in a bedroom with J.D., G.D.'s younger sister. She testified that Moreno and J.D. had their pants and underwear down, and that J.D. then told G.D. that Moreno had engaged in sexual acts with her.

J.D. testified at the preliminary examination that Moreno told her to go "to the . . . room when nobody's in there and he started raping me," and that "[h]e raped me for four years." J.D. specified that these instances involved Moreno penetrating her vagina with his penis. She testified that this occurred "more than 50 -- 55" times, and that it occurred both when J.D. lived in the same house as Moreno and earlier when J.D. lived in an apartment separately from Moreno. J.D. also testified that Moreno committed other acts on her, including digitally penetrating her more than 50 times and touching her breasts about 10 times. Moreno's counsel cross-examined both girls on a variety of matters, including that J.D.'s allegations in her preliminary examination testimony were much more extensive than her previous disclosures to law enforcement. The cross-

examination of J.D. at the preliminary examination consisted of more transcribed pages than the direct examination of J.D.

A second amended information listed 15 counts against Moreno. Counts 1 through 7 involved acts against G.D., alleging oral copulation or sexual penetration with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b); counts 1-2), aggravated sexual assault by sexual penetration of a child under the age of 14 and seven or more years younger than the defendant (Pen. Code, § 269, subd. (a)(5); counts 3-4), and lewd or lascivious acts on a child by force, violence, duress, menace, or fear (Pen. Code, § 288, subd. (b)(1); counts 5-7). Counts 8 through 15 listed J.D. as the victim and alleged that Moreno committed sexual intercourse or sodomy with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (a); counts 8-9), oral copulation or sexual penetration with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b); counts 10-13), and lewd or lascivious acts on a child by force, violence, duress, menace, or fear (Pen. Code, § 288, subd. (b)(1); counts 14-15).

B. *Trial Proceedings*

The prosecution's motions in limine included a request under section 1360 to introduce video footage of prior statements G.D. and J.D. made to law enforcement.[3] The motion asserted that G.D. and J.D. were both expected to testify at trial, and that the prior statements contained sufficient indicia of reliability to be admissible. In a later supplemental filing on September 21, 2023, the prosecution sought to introduce J.D.'s

---

[3] "Section 1360 creates a limited exception to the hearsay rule in criminal prosecutions for a child's statements describing acts of child abuse or neglect, including statements describing sexual abuse. [Citations.]" (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367.) Such a statement is admissible under this provision if the statement is not otherwise admissible, if the court finds that the time, content, and circumstances of the statement provide sufficient indicia of reliability, and if the child either testifies at the proceedings or is "unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child." (§ 1350, subd. (a).)

prior statements under section 1360 even if she proved unavailable to testify at trial. The supplemental motion in limine asserted: "[J.D.], since the events of this crime, has become a habitual runaway and victim of human trafficking. In just 2023 alone, there are roughly over 20 San Jose Police Department reports of [J.D.] running away from her mother's residence and juvenile shelters. [¶] At the time of this motion, [J.D.] is residing at a shelter for at-risk juvenile girls in Sa[nt]a Barbara County. The People will/have personally served her with a subpoena for trial on 10/2. However, there is a potential that [J.D.] may run[ ]away despite this service and arrangements for her presence at trial." The trial court took the motion under advisement.

Opening statements and testimony from the prosecution's expert witness on child sexual abuse accommodation syndrome took place on October 6, 2023.[4] Near the end of proceedings that day, the prosecution stated that travel arrangements had been made for J.D. to be present and testify on Thursday, October 12. However, the parties discussed the possibility that J.D. would not appear. The trial court stated that this issue would be addressed the following week, and that if J.D. could not be located, the court would need to conduct an inquiry to determine whether the prosecution had made diligent efforts to secure J.D.'s appearance and whether J.D.'s preliminary examination testimony could be admitted.

The next day of trial proceedings took place four days later on Tuesday, October 10. At the start of that day's proceedings, the prosecutor stated: "I received notice, roughly, 25 minutes ago that it looks like Victim 2, [J.D.], is no longer at the facility. It looks like she has ran away [*sic*] on Saturday."

The prosecutor stated that there was "still a likelihood" J.D. would testify as scheduled on October 12. However, the prosecutor stated that there was a possibility J.D. would not be present to testify as scheduled and that the court would need to consider the

_____

[4] All trial proceedings in this case took place in the year 2023.

4

prosecution's request to introduce J.D.'s preliminary examination testimony. Moreno's trial counsel responded that it would be "fundamentally unfair" to allow the prosecution to introduce J.D.'s preliminary examination testimony. Moreno's counsel stated that he would "skip the issues of due diligence" concerning the prosecutor's efforts to secure J.D.'s appearance, given updates the prosecutor had provided on this issue. Instead, Moreno's counsel alleged "a fundamental fairness issue" regarding "the opportunity to confront and cross-examine" due to potential impeachment material that arose after the preliminary examination. The trial court deferred consideration of this issue until the end of the day's proceedings to allow time for further updates regarding J.D.

That same day, G.D. testified as to various acts of sexual abuse Moreno committed upon her, including touching her breasts, vagina, and "butt." She also testified that she walked into her grandmother's bedroom one day and saw J.D. in front of Moreno, both with their pants down. G.D. testified that J.D. "looked scared" and that G.D. pulled J.D. out of the room. G.D. testified that this motivated her to report Moreno's actions. No discussion regarding J.D.'s availability was placed on the record at the end of proceedings on October 10.

The next day, October 11, G.D.'s testimony concluded after an evidentiary hearing regarding testimony by a prosecution witness. The girls' mother also testified regarding the family structure and recent changes in J.D.'s behavior, including running away and an instance in which J.D. was detained for mental health treatment under Welfare and Institutions Code section 5150.[5] A friend of the girls' grandmother testified that on the same day the girls reported Moreno's actions, G.D. told her, " 'someone abused me.' " A

_____

[5] Welfare and Institutions Code section 5150 states in relevant part: "When a person, as a result of a mental health disorder, is a danger to others, or to themselves, or gravely disabled," certain listed persons "may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services." (*Id.*, subd. (a).)

police officer also testified as to statements G.D. provided on the day of the initial report, while another officer testified as to G.D.'s statements at a follow-up interview.

At the end of trial proceedings on October 11, the prosecutor stated that he had no new updates as to J.D.'s availability and that his most recent information indicated that J.D. had not returned to the facility in Santa Barbara. The trial court asked for the parties' positions as to whether J.D. was unavailable to testify. As the prosecutor started to outline steps the prosecution had taken to demonstrate reasonable diligence in obtaining J.D.'s appearance at trial, Moreno's counsel interjected that "I am not even going to challenge the due diligence" and that from what the prosecutor had previously outlined, "it sounds fairly diligent." The trial court thus stated that "I think we can all agree that, you know, there's a diligent effort to locate her," and Moreno's counsel did not challenge this characterization.

The prosecution then asserted that J.D.'s preliminary examination testimony met the criteria for admission as former testimony offered against a party to the former proceeding under section 1291, including that Moreno had the right and opportunity to cross-examine J.D. at the preliminary examination. The prosecution acknowledged that some potential impeachment information had arisen following the preliminary examination, specifically a report J.D. made in April 2022 that her mother slapped her—a claim the prosecutor stated J.D.'s mother and G.D. denied—and an allegedly false rape accusation J.D. made in February 2023 against another person. However, the prosecutor asserted that the later existence of this information did not deprive Moreno of a full and fair opportunity to cross-examine J.D. at the preliminary examination.

Moreno's counsel noted that Moreno was represented by a different attorney at the preliminary examination, and argued that admitting J.D.'s preliminary examination testimony would violate Moreno's right to confront and cross-examine J.D. Moreno's counsel also asserted that evidence of the recent allegedly false rape accusation by J.D. would provide grounds for cross-examination that did not exist at the time of the

6

preliminary examination, and that even though the defense could call a teacher to testify as to the allegedly false rape accusation, "it would be fundamentally unfair to proceed with the information as is currently constituted." However, Moreno's counsel asked for time to review legal authority the prosecutor cited, and the trial court deferred consideration of the matter until the following morning.

Discussion regarding this matter resumed the following morning, October 12—the day J.D. was scheduled to testify. The prosecutor summarized efforts made to secure J.D.'s appearance, including service of a subpoena, communications with a social worker assigned to J.D. "on virtually a daily basis over the past two and a half, three weeks," the social worker's statement that according to the facility coordinator J.D. had still not returned to the facility, travel arrangements made for J.D., and the filing of a missing persons report. The prosecutor stated that the social worker was available to testify to these matters if needed. In response, Moreno's counsel submitted on the issue of whether the prosecutor had exercised reasonable diligence in securing J.D.'s appearance, stating that it "certainly seemed as though there's been regular contact." Moreno's counsel stated that "it seems like this person is purposely avoiding this proceeding," and expressed concern that J.D. may show up at the facility that day, thinking she had successfully avoided testifying. Thus, the defense requested a 24-hour continuance to see if J.D. showed up at the juvenile facility. The trial court granted the continuance and stated it would sign a warrant directing a body attachment that the prosecution prepared, "to the extent that it is legally permissible" to direct a body attachment for a minor.

The following day, October 13, the prosecutor stated that J.D. still had not returned to the facility and outlined further efforts to secure J.D.'s appearance, including issuance and service of a warrant directing a body attachment. The trial court stated that based on this information, J.D. was unavailable for purposes of that day's proceedings. The trial court asked Moreno's counsel whether he had "any issues with the diligence that the People have demonstrated in attempting to secure [J.D.'s] appearance at trial?"

7

Moreno's counsel responded: "My issues are not necessarily with the People, Your Honor. It's with [J.D.]. Because I believe [J.D.'s] unavailability is intentional. Unless the Court has problems with their diligence, their diligence isn't my issue; it's her absconding intentionally from this process." Accordingly, the trial court concluded that the prosecution had made a diligent effort to secure J.D.'s appearance at trial and that J.D. was currently unavailable.

The trial court then turned to the question of whether J.D.'s preliminary examination testimony should be introduced. The prosecution argued that the requirements of section 1291 were met, thus permitting the preliminary examination testimony to be introduced. Moreno's counsel argued that introducing the preliminary examination testimony was not appropriate because information that could form a basis for cross-examination was provided after the preliminary examination, including some reports that counsel stated existed before the preliminary examination involving allegedly false reports the girls had made of violence in their home. Moreno's counsel asserted that the preliminary examination cross-examination of J.D. was based solely on the police interviews of J.D., and that J.D.'s preliminary examination testimony represented "an exponential increase in accusations" compared to the police interviews. Because of this, the defense asserted that there was "no real full and fair opportunity to cross-examine [J.D.] on the supplemented or increased accusations that she leveled at the preliminary hearing," and "it would be fundamentally unfair" to read J.D.'s preliminary examination testimony into evidence.

The trial court stated that this was "a difficult issue" because J.D.'s preliminary examination testimony increased Moreno's punitive exposure. However, based in part on *People v. Gonzalez* (2012) 54 Cal.4th 1234 (*Gonzalez*), the trial court stated that "it's not required that all impeachment material be available to the defense at the preliminary hearing, at the time of the preliminary hearing, in order for the Court to find that a full and meaningful opportunity for cross-examination has occurred." The trial court stated

that it reviewed the preliminary examination transcript and found "that a full and meaningful opportunity for cross-examination has occurred." Thus, the trial court allowed the prosecution to read J.D.'s preliminary examination testimony into evidence under section 1291. The prosecution therefore read J.D.'s preliminary examination testimony into evidence (with certain redactions discussed in advance) that same day, October 13.

Trial continued that afternoon with the final two prosecution witnesses: a police officer who conducted the initial interview with J.D., and a female family member. The female family member testified concerning an incident when she was 14 years old and was alone in the house with Moreno. She testified that as she laid on the couch upset over having broken up with her boyfriend, Moreno told her she could ask him and not her mother for help, offered to give her money, hugged and kissed her, and told her she was "young" and "beautiful." She testified that Moreno never exhibited this type of behavior when others were present and that it struck her as "kind of weird." She testified that she tried to push Moreno away as he was kissing her, that Moreno's actions made her "very uncomfortable," that she told her mother about what happened, and that she left the house and partially moved out after Moreno's actions. The prosecution rested its case-in-chief that afternoon.

The defense's witnesses on the next day of trial proceedings, October 16, included two people who had regularly hired Moreno for various property management jobs and who testified as to Moreno's character. The defense also called the teacher of a therapeutic class J.D. attended in 2022 and 2023. The teacher said that in February 2023, J.D. alleged that her friend's boyfriend had "forced her to have sex." The teacher testified that police responded and that while J.D. went "back and forth," at one point she said her allegation was "made up." However, the teacher stated that "in my heart I believe it could be a true story."

9

The following day, October 17, Moreno's son testified as to Moreno's character. Moreno also testified, denying that he committed the charged offenses. Moreno's testimony started on October 17 and continued on October 18 before concluding on the afternoon of October 19. He testified that G.D. and J.D. only lived at the house with him from August 27, 2019, until the girls reported Moreno's actions to police on November 14, 2019, and that during this time 14 people lived in the two-bedroom duplex. He testified that before the girls lived at the house with him, he rarely visited the apartment at which the girls resided and that his work schedule kept him busy.

On cross-examination, the prosecutor extensively questioned Moreno as to the frequency of his interactions with G.D. and J.D., and Moreno repeatedly stated that he did not remember how often he saw the girls. Moreno agreed on cross-examination that he "never really had much one-to-one interaction" with G.D. and J.D. and that he "didn't really have any sort of personal interaction with" the girls. Moreno testified that he had memory issues in responding to questions from the prosecutor and that "[t]here are times when I do forget things." The defense rested its case-in-chief on the afternoon of October 19.

The prosecution began its rebuttal case that same afternoon, October 19, calling a police officer who spoke with Moreno the day after the girls reported the sexual abuse. Through this officer, the prosecution played several video clips of this discussion. In these video clips, Moreno stated that: the girls have been to his house "many times"; the girls gave him "little kisses" and that his saliva would be present on them; he gave G.D. kisses on the forehead and cheeks, hugged her, and lifted her; "[m]aybe [he] would have" kissed G.D. on the mouth; and he did not remember touching the girls' vaginas and that any such touch was "without intention." When asked if he touched G.D.'s vaginal area outside her clothes, Moreno discussed lifting and holding G.D. and grabbing the girls.

Trial was scheduled to resume on the following Tuesday, October 24, with the prosecution's remaining rebuttal case, jury instructions, and closing arguments expected

10

to take place that day. At the outset of proceedings on October 24, the prosecutor stated that J.D.'s mother informed him that J.D. had been recovered and had been detained for mental health evaluation under Welfare and Institutions Code section 5150. The prosecutor stated that he then contacted the social worker assigned to J.D.'s case, who confirmed that J.D. was in a "locked facility in Fremont Hospital" pursuant to Welfare and Institutions Code section 5150 and that the social worker intended to request that J.D.'s detention for mental health evaluation be extended to 14 days pursuant to Welfare and Institutions Code section 5250.[6] The prosecutor stated that these conversations took place on Friday, October 20, and that he encouraged the social worker to continue efforts to bring J.D. to trial.

The prosecutor then stated that on Monday morning he spoke with the social worker, who stated that a 14-day detention under Welfare and Institutions Code section 5250 had been granted. The prosecutor stated that the social worker told him the hospital "would not release [J.D.] just to come to court absent a complete discharge." The prosecutor stated that he spoke to the social worker again on Monday, and that the social worker relayed that the hospital's case manager would not release J.D. The prosecutor summarized: "Right now it appears she will not be released prior to the end of the 5250 hold, which is November 5th, which is approximately two weeks from yesterday, and that she needs to be given medication. Given her condition, she needs to be given psychiatric medication to, quote/unquote, stabilize her." The prosecutor stated that he had previously informed the trial court and defense counsel of these developments.

---

[6] Welfare and Institutions Code section 5250 states in relevant part that if a person is detained for 72 hours under Welfare and Institutions Code section 5150 "and has received an evaluation, the person may be certified for not more than 14 days of intensive treatment related to the mental health disorder or impairment by chronic alcoholism," under certain listed conditions. (*Id.*, § 5250.)

11

The prosecutor asserted that based on this information, J.D. remained unavailable and trial should proceed without her appearance. The prosecutor contended that this course of action was appropriate because J.D. "physically . . . cannot leave a locked facility because she's under a psychiatric hold" and secondarily because the information about J.D.'s mental health condition "raises an issue[] regarding her competence to testify if she is on a 5250 hold and actively taking psychiatric medication she has not stopped taking to stabilize her."

Moreno's counsel stated that the defense's position had already been that reading J.D.'s preliminary examination testimony "is offensive to the Sixth Amendment right to confront and cross-examine." After raising questions regarding the timeline of events in the preceding days, Moreno's counsel stated that "I don't think we know about [J.D.'s] competence" and suggested that after J.D. appeared, an evidentiary hearing under section 402 could determine J.D.'s competence. Moreno's counsel asserted that J.D. might be released at some point before the 14-day period elapsed on November 5, and that the trial court could compel her testimony at any point despite the Welfare and Institutions Code section 5250 detention. Moreno's counsel concluded: "So our position is, at least provisionally today, [J.D.] is available, and we should inquire about compelling her attendance here. We should take whatever brief continuance, if necessary, to do that, and we should have a [section] 402 hearing when she does get here regarding her competence rather than assuming that she's not competent."

The trial court denied the defense's request for a continuance to conduct an evidentiary hearing regarding J.D.'s availability and competence. The court ruled: "I'm going to maintain that [J.D.] is unavailable based on the representation of [the prosecutor]. The Court would deny [defense counsel's] request for a continuance given where we are in this trial. The Court will also note that -- based upon representation of [the prosecutor], that forcing [J.D.] to appear at this juncture may inflict certain

12

psychological harm on her, and the Court isn't willing to do that. So we will proceed with the trial, and we will maintain that [J.D.] is unavailable."

That same day, October 24, the prosecution called its remaining rebuttal witness, one of the defense witnesses who had testified concerning his interactions with Moreno as Moreno performed jobs for the witness. This witness testified that he observed no issues with Moreno's comprehension or memory. Jury instructions took place that day and closing arguments began that afternoon.

The jury convicted Moreno of all 15 counts listed in the second amended information, and found true multiple victim allegations regarding five of the counts (Pen. Code, § 667.61, subds. (e)(4) & (j)(2)). The trial court sentenced Moreno to a total term of 295 years to life. This appeal timely followed.

## II. DISCUSSION

Moreno does not challenge the trial court's initial ruling that the prosecution could read J.D.'s preliminary examination testimony into evidence. Instead, Moreno focuses his argument on the trial court's ruling near the end of trial denying the defense's request for a continuance and an evidentiary hearing concerning J.D.'s reported return to the juvenile facility and her detention under Welfare and Institutions Code section 5250. He argues: "The trial court's ruling was an abuse of discretion. The court presumably found [J.D.] unavailable under section 240, subdivision (a)(3), which provides in pertinent part that a witness is unavailable when they are 'unable to attend or to testify at the hearing because of then-existing physical or mental illness or infirmity.' But there was no evidence regarding [J.D.'s] 'then-existing physical or mental illness or infirmity.' [Citation.] Rather, the case manager apparently told the social worker who then apparently told the prosecutor who then told the trial court that [J.D.] would not be discharged until November 5 and that she was taking medication. Based on the multiple layers of hearsay, the prosecutor came to the 'sort of conclusion' that [J.D.] was unavailable to testify, and the trial court agreed. [Citation.] But there was no evidence

13

that [J.D.] was 'unable to attend or to testify at the hearing because of then-existing physical or mental illness or infirmity.' On the contrary, the triple hearsay—as untrustworthy as it was—tended to show that [J.D.'s] mental facilities had been 'stabilize[d].' " Moreno asserts that the trial court's error was prejudicial because J.D.'s testimony constituted the only evidence regarding counts 8 through 15. Thus, Moreno asks this Court to reverse his convictions on counts 8 through 15.

The Attorney General contends that the trial court did not abuse its discretion in denying the defense's request for a continuance and an evidentiary hearing based on the prosecutor's representations that J.D. was being detained in a locked facility pursuant to Welfare and Institutions Code section 5250. The Attorney General argues that Moreno forfeited any argument on appeal that the trial court did not base its decision on sufficient evidence because he did not object to the trial court's consideration of the prosecutor's representations. Moreover, the Attorney General asserts that Moreno was not prejudiced by any error because J.D.'s preliminary examination testimony had already been read to the jury.

We conclude that the trial court did not abuse its discretion in denying Moreno's request for a continuance and an evidentiary hearing made near the end of trial, after J.D.'s preliminary examination testimony had already been read into evidence. Thus, we need not address the Attorney General's forfeiture and harmless error arguments.

**A.** *Legal Principles and Standard of Review*

"Hearsay is 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' [Citation.] Hearsay is inadmissible unless it falls under an exception. [Citation.] Evidence Code section 1291 provides one such exception by allowing the admission of former testimony if the declarant is unavailable, the party against whom the evidence is offered was a party in the prior proceeding, and that party had the opportunity to cross-

14

examine the declarant with an interest and motive similar to that of the trial. [Citation.] When these requirements are met, the admission of former testimony does not violate a defendant's constitutional right of confrontation. [Citation.]" (*People v. Ng* (2022) 13 Cal.5th 448, 539.)

"Frequently, a defendant's motive for cross-examining a witness during a preliminary hearing will differ from his or her motive for cross-examining that witness at trial. For the preliminary examination testimony of an unavailable witness to be admissible at trial under Evidence Code section 1291, these motives need not be identical, only 'similar.' [Citation.] Admission of the former testimony of an unavailable witness is permitted under Evidence Code section 1291 and does not offend the confrontation clauses of the federal or state Constitutions—not because the opportunity to cross-examine the witness at the preliminary hearing is considered an exact substitute for the right of cross-examination at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution. [Citations.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 975.)

Section 240 states that a declarant is generally unavailable if the declarant meets any of six conditions, including if the declarant is "[d]ead or unable to attend or to testify at the hearing because of then-existing physical or mental illness or infirmity" (*id.*, subd. (a)(3)), is "[a]bsent from the hearing and the court is unable to compel his or her attendance by its process" (*id.*, subd. (a)(4)), or is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process" (*id.*, subd. (a)(5)). "The constitutional right to confront witnesses mandates that, before a witness can be found unavailable, the prosecution must 'have made a good-faith effort to obtain his presence at trial.' [Citations.] The California Evidence Code contains a similar requirement. As relevant, it provides that to establish unavailability, the proponent of the evidence, here

15

the prosecution, must establish that the witness is absent from the hearing and either that 'the court is unable to compel his or her attendance by its process' [citation] or that the proponent 'has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process' [citation]. The constitutional and statutory requirements are 'in harmony.' [Citation.] The proponent of the evidence has the burden of showing by competent evidence that the witness is unavailable. [Citation.]" (*People v. Smith* (2003) 30 Cal.4th 581, 609.)

We review the trial court's ruling that the prosecutor exercised reasonable diligence in attempting to obtain the declarant's attendance de novo. (*People v. Cromer* (2001) 24 Cal.4th 889, 893.) However, "[w]e review the trial court's decision to admit . . . prior testimony for abuse of discretion. [Citation.]" (*People v. Thomas* (2023) 14 Cal.5th 327, 375, fn. omitted.)

Section 402 permits a trial court to "hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury . . . ." (*Id.*, subd. (b).) A trial court's decision not to conduct a section 402 evidentiary hearing is reviewed for an abuse of discretion. (*People v. Garcia* (2005) 134 Cal.App.4th 521, 540.)

"A criminal trial may be continued only for good cause [citation], and the trial court has broad discretion in handling the request. [Citation.] In determining whether a continuance was properly denied, the reviewing court examines the specific circumstances, including the benefits and burdens of postponing a trial that is already underway. [Citation.] In reality, such challenges rarely have merit or cause reversal of the judgment on appeal. [Citation.]" (*People v. Garcia* (2011) 52 Cal.4th 706, 758.) " 'Particularly, when the party seeks a continuance to secure a witness's testimony, the party must show that he exercised due diligence to secure the witness's attendance, that the witness would be available to testify within a reasonable time, that the testimony was material and not cumulative.' [Citation.] '[I]f the supporting affidavits do not show where the desired witness is and that his testimony can be obtained within a reasonable

16

time it is not an abuse of discretion in the court to refuse to grant a continuance.' [Citation.]" (*People v. Temple* (2025) 110 Cal.App.5th 1281, 1302.) "A trial court has ' "broad discretion to determine whether good cause exists to grant a continuance of the trial" '; we review that determination for abuse of discretion. [Citation.]" (*People v. Wilson* (2024) 16 Cal.5th 874, 939.)

### B. *Analysis*

We conclude that the trial court did not abuse its discretion in denying the defense's request to continue the trial and conduct an evidentiary hearing to determine J.D.'s availability and competence to testify. The trial court had already determined that J.D. was unavailable to testify. The trial court based its determination in part on the defense's agreement that the prosecution exercised reasonable diligence in attempting to secure J.D.'s appearance at trial. Based on this finding and its findings concerning J.D.'s unavailability and the defense's prior right and opportunity to cross-examine J.D., the trial court permitted the prosecution to read J.D.'s preliminary examination testimony into evidence on October 13 during the prosecution's case-in-chief.

Moreno does not specifically challenge this ruling on appeal. His summary of the issue on appeal states as follows: "The trial court violated appellant's right to confront the witnesses against him under the Sixth Amendment when the court ruled that [J.D.] was unavailable to testify at trial and admitted her preliminary hearing testimony in lieu of live testimony." However, the substance of Moreno's argument does not assert that the trial court erred in its initial ruling that J.D.'s preliminary examination testimony could be read into evidence. His argument is solely directed at the trial court's later ruling denying the defense's request for a continuance and an evidentiary hearing once the prosecutor represented that J.D. had returned to the juvenile facility and was detained for mental health evaluation and treatment. Moreno contends that the trial court's October 24 ruling was based on the prosecutor's representations, rather than evidence.

17

Moreno does not assert that the prosecution failed to exercise reasonable diligence to secure J.D.'s appearance earlier at trial and he does not offer any argument that J.D.'s preliminary examination testimony should not have been introduced in the first place under section 1291. To the extent that Moreno challenges the trial court's initial ruling that J.D.'s preliminary examination testimony could be read into evidence under section 1291, Moreno has forfeited this argument by not supporting it with sufficient argument or authority. (See *People v. Jones* (1998) 17 Cal.4th 279, 304 [a claim presented "perfunctorily and without supporting argument" may be rejected in similar fashion].)

The question thus becomes not whether the trial court erred by finding J.D. unavailable and permitting the prosecution to read her preliminary examination testimony into evidence, but instead whether the trial court abused its discretion by denying the defense's request made near the end of the trial to grant a continuance and to conduct an evidentiary hearing on the issue of J.D.'s availability and competence to testify. We find no abuse of discretion in this regard.

The prosecutor made his representations about J.D.'s return to the juvenile facility and mental health commitment on October 24, after both sides had rested their cases-in-chief and on the day closing argument was set to take place in a trial that was already on its tenth day following jury selection. The prosecutor represented that J.D. was in a locked mental health facility for a two-week period and was receiving medication to stabilize her. Moreno argues that the trial court must base an unavailability determination on competent evidence rather than a prosecutor's representations, but the issue before the trial court on October 24 was whether to continue the trial and conduct an evidentiary hearing, not whether J.D. was unavailable and thus whether to admit her preliminary examination testimony. The issue of J.D.'s availability had already been decided and the burden was on Moreno to demonstrate grounds for a continuance.

18

In determining whether a continuance was warranted to conduct an evidentiary hearing on this matter, the trial court was permitted to rely on representations made by the prosecutor as an officer of the court. (See *People v. Medina* (1995) 11 Cal.4th 694, 731 [prosecutor's representations of defendant's prior violent conduct sufficient to support shackling defendant without conducting an evidentiary hearing]; *People v. Bankers Ins. Co.* (2021) 69 Cal.App.5th 473, 479 [trial court may rely on defense counsel's representations in determining whether to grant a continuance for a defendant's failure to appear]; *People v. Buckley* (1972) 23 Cal.App.3d 740, 744 [trial court may rely on officer of the court's statements in determining the appropriateness of a continuance to secure an absent witness].) "[R]epresentations as an officer of the court are accepted in the absence of proof to the contrary. [Citation.]" (*People v. Thoi* (1989) 213 Cal.App.3d 689, 700.) The prosecutor in the instant case made representations based on the information presented to him about J.D.'s availability and mental health condition. In the absence of any evidence Moreno presented to the contrary, the trial court was permitted to rely on those representations in determining whether to continue the trial to further explore these matters.

Moreno argues that not further inquiring into J.D.'s availability prevented the defense from cross-examining J.D. on the allegedly false rape allegation. However, Moreno has not demonstrated that this potential line of cross-examination warranted a continuance. "[W]hen a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement [citation], regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 851.) Thus, the California Supreme Court has held that where the defense gains access to information after a preliminary examination that provides potential grounds for cross-examination, this does not necessarily deprive the defense from a meaningful opportunity to cross-

examine the witness at the preliminary examination.  (*Gonzalez*, *supra*, 54 Cal.4th at p. 1262.)  The trial court cited *Gonzalez* in its initial section 1291 ruling, demonstrating its awareness that the later existence of potential impeachment information did not mean Moreno was deprived of a meaningful opportunity to cross-examine J.D. at the preliminary examination.  Consistent with the trial court in *Gonzalez*, the court here made clear that the "subsequently developed evidence" of the false rape charge offered to impeach J.D.'s credibility was admissible.  (*Gonzalez*, *supra*, at p. 1262.)  By the time of the trial court's October 24 ruling, the defense had already called a witness who testified that J.D. admitted her 2023 rape allegation was "made up."  The trial court could consider the defense's earlier opportunity to cross-examine J.D. and the evidence the defense introduced as to the allegedly false rape accusation in determining that a continuance and an evidentiary hearing were not warranted.

J.D. was unavailable during the prosecution's case-in-chief because she was "[a]bsent from the hearing and the proponent of . . . her statement . . . exercised reasonable diligence but [was] unable to procure . . . her attendance by the court's process."  (§ 240, subd. (a)(5).)  The prosecution established its efforts to secure J.D.'s appearance at trial, including issuing a subpoena and procuring a warrant for a body attachment, and maintaining regular contact with J.D.'s social worker to determine her whereabouts and arrange for her travel to trial.  The defense did not dispute that the prosecution exercised reasonable diligence in this regard, and thus the trial court allowed J.D.'s preliminary examination testimony to be read to the jury under section 1291.  The prosecutor continued his efforts to determine J.D.'s whereabouts throughout the remainder of the trial, and the trial court was permitted to rely on the prosecutor's representations in determining that a continuance and evidentiary hearing to determine J.D.'s further availability and competence to testify were not warranted.  The trial court was also permitted to consider the fact that word of J.D's return and mental health detention came on the day closing arguments were scheduled to take place in a lengthy

trial.  We see no abuse of the trial court's broad discretion in denying the defense's request for a continuance and an evidentiary hearing.

### III. DISPOSITION

The judgment is affirmed.

_____

Greenwood, P. J.

WE CONCUR:


_____

Lie, J.


_____

Rodriguez, J.*


H051637
People v. Moreno


_____

     \* Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution